IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOHN R. VELDINK,

      Plaintiff,

                                   3:12-cv-01029-PK

                                   OPINION AND ORDER

v.

BOISE CASCADE CORPORATION, et al.,

      Defendants.

_____

PAPAK, Judge:

      Plaintiff John Veldink brings this claim for negligence against an array of Boise Cascade

entities. His claim arises out of injuries he sustained when the boat he was riding in crashed into

steel pilings owned by one of the defendants, Boise White Paper, L.L.C. Defendants deny that

their negligence in any way contributed to the crash and Plaintiff's injuries, and they filed a

motion for summary judgment. For the reasons set forth below, Defendants motion for summary

judgment (#14) is granted.

I will start by defining two terms of art that are important to this case. The first is "allision." In seafaring parlance, an allision occurs when a moving vessel strikes a stationary object. A collision, by contrast, involves two moving vessels. The distinction between an allision and a collision is important in maritime law because the standard of care and burden of proof differ for each.

The second term of art is "dolphin." As used in this case, a dolphin is a man-made marine structure consisting of a pile or joined cluster of piles. The piles are driven deep into the ground below the water, and they extend above the water's surface. A dolphin is a fixed structure used to moor vessels or which a mooring vessel may use as a fender.

This is a case about an allision with a dolphin.

## FACTUAL BACKGROUND[1]

On April 13, 2010, Plaintiff and his friend David White set out in White's 18-foot boat to go salmon fishing. They launched at the Scappoose Bay Marina around 5:05 a.m. with Columbia River Buoy 77 as their intended destination. It was dark out, raining, and the water was described as "hazardous."

White made his way out of the marina with the aid of the marina lights. He navigated out of Scappoose Bay by having Plaintiff use a flashlight to locate red and green floating channel markers. White also used a GPS trail to navigate out of Scappoose Bay and into the lower Multnomah Channel. On prior daylight outings between Scappoose Bay and Buoy 77, it was

---

[1] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

White's habit to turn on his boat's GPS so it "automatically lays out a track" that he can later use in case he has to move through that area in the dark.

White and Plaintiff stopped using the flashlight when they entered the Multnomah Channel. White explains:

> As we moved downstream, there were no markers, you're simply trying to see where you're going, we had no buoy markers, nothing to look for, so as long as we stayed in relatively deep water, which is not very deep, about 20 feet for a long ways there, we shut off the flashlight because the reflection of it against the rain was bothering our eyes.

(Boyajian Decl., #17, Ex. A at p. 13.) Plaintiff, who had been standing to help White navigate, got cold from the breeze when the boat sped up so he sat down, leaving White to navigate on his own. White then navigated standing at the bow watching for any debris that might be in the water. He does not remember referring to his GPS trail once he got in the Multnomah Channel.

White opted to proceed on the left side of the channel because the water is shallow on the right side. Two or three boats passed closely on their right going at a high rate of speed, and White states "their wake was pushing me around." (*Id.* at p. 15-16.) White was aware of and concerned that he was traveling in a path that was too far left. So, after the last boat passed, White moved his boat to the right some to retreat into the calm area of that boat's wake.

White soon lost sight of the passing boat, and then came upon a stationary or slow moving boat in front of him. In his handwritten account of the incident attached to an Oregon State Marine Board Recreational Boating Accident Report, White recounts:

> A white light appeared ahead and then a bowlight to the left of the white light indicating a boat turning to the left. I adjusted to the left, saw the paper mill loading crane against the sky indicating I was dangerously close to a pier (seen in earlier trips), started turning to the right while seeing a dolphin just before impact.

(*Id.* at p. 27.)

Page 3 - OPINION AND ORDER

Similarly, in his deposition White recalls:

> I don't remember when we passed [the stationary boat] or where it was, but it wasn't very far past that that I saw that boom, I knew what that is, and I started to turn to the right, and at that time, I saw, okay, the dolphin, and it was right there on me.  I turned hard, but we hit it.

(Pl's Response, #19, Att. 1 (Gutzler Decl. at Ex. 4, 41:3-16).)  At impact, Plaintiff was severely injured.

**The Docking Facility and the Dolphin**

The "loading crane" and "boom" White referred to is a loading crane at a docking facility located on the Oregon shore of the Multnomah Channel in the Columbia River at mile 87.3.  In 2000, Boise Cascade Corporation (now known as OfficeMax) was the owner of the docking facility, which includes a dock and various associated piles and dolphins.  The facility changed ownership with various Boise Cascade transactions over the last 12 years, and it is currently owned by Boise White Paper, L.L.C.

The dolphin that the White vessel allided with is constructed of five steel pilings driven deep into the river bed.  Engineering drawings indicate that at a low water mark the dolphin would extend at least twenty-six feet above water level, and at the high water mark it would be at least four feet above water level.  The dolphin is essentially in line with the Boise White Paper dock and as such it is near the Oregon bank of the river.

The dolphin that previously occupied this spot was made of wood.  In 2000, Boise Cascade Corporation applied for and received a permit from the Army Corps of Engineers to replace the wood dolphin with the current steel pile dolphin.  Construction was completed within a few months of the permit being issued.  Upon completion Boise Cascade Corporation

submitted the requisite Compliance Certification to the Army Corps of Engineers which states in relevant part "that the work authorized by the above referenced permit has been completed in accordance with the terms and conditions of the said permit." (Garber Decl., #16, Ex. 2 at p. 2.)

White knew this docking facility existed because "each time you leave Scappoose bay, you go by that facility." (Boyajian Decl., #17, Ex. A at p. 15-16.) It is unclear how many times White had gone past the Boise Cascade facility prior to the allision, but he states he has traveled past it both in the daytime and in the dark, and he expressly knew the "wharf" or dock structure was there, but he did not recall having ever seen the individual dolphin that he struck.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). When considering a motion for summary judgment, the district court's role is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial. *Liberty Lobby,* 477 U.S. at 249; *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323.

Only after the moving party has made such a showing does the burden shift to the opposing party

to show that a genuine issue of fact remains. *See* Fed. R. Civ. P. 56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must

make an adequate showing as to each element of the claim on which the non-moving party will

bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322-23; *see also Taylor v. List,* 880

F.2d 1040, 1045 (9th Cir. 1989). The opposing party may not rest on conclusory allegations or

mere assertions, *see Taylor,* 880 F.2d at 1045; *Leer v. Murphy,* 844 F.2d 628, 631 (9th Cir.

1988), but must come forward with significant probative evidence, *see Liberty Lobby,* 477 U.S.

at 249-50; *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir. 1989). The evidence set forth by the non-

moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for

the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587

(1986); *Taylor,* 880 F.2d at 1045.

## DISCUSSION

This is a relatively straightforward maritime tort claim of negligence. Maritime

negligence causes of action include the usual elements: (1) the existence of a duty; (2) breach of

that duty; (3) proximate cause; and (4) damages. See *Morris v. Princess Cruises, Inc.,* 236 F.3d

1061, 1070 (9th Cir. 2001). The existence of a duty is an issue of law properly resolved on

summary judgment. *Tindall v. United States,* 901 F.2d 53, 56 (9th Cir. 1990).

As background information, I first note that neither White nor White's vessel is a party to

this lawsuit.[2] This is somewhat significant because under maritime law it is well-settled that a

---

[2] Although Plaintiff argued in his memoranda that summary judgment should be denied
because questions of fact exist regarding White's negligence, Plaintiff agreed at oral argument
that only the Defendants' negligence is at issue for purposes of this summary judgment motion.

moving vessel in navigation which strikes a stationary object is presumptively at fault. *The Oregon*, 158 U.S. 186, 193 (1895). "Ultimately, the presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way." *American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir. 1988). Applying this rule means White (or, more accurately, his vessel) is presumptively at fault for alliding with the dolphin. However, this presumption of fault is not determinative of sole liability. *See, e.g. Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport*, 596 F.3d 357, 362 (6th Cir. 2010) ("[n]ot unlike the doctrine of *res ipsa loquitur*, the *Oregon* Rule creates a *prima facie* case of negligence, not a final case of sole negligence."); *City of Chicago v. M/V Morgan*, 375 F.3d 563, 572 (7th Cir. 2004) (*Oregon* Rule presumption "merely addresses a party's burden of proof and/or burden of persuasion; it is not a rule of ultimate liability.") Under maritime law, liability for damage is allocated "proportionately to the comparative degree of their fault." *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975). Accordingly, one of the ways the *Oregon* Rule presumption can be rebutted, in whole or in part, is through evidence that the stationary object is in some way at fault. *Wardell v. Dept. of Transp.*, 884 F.2d 510, 513 (9th Cir. 1989). So, even though White is presumed to be at fault as the vessel that struck a stationary object, there is room in maritime law to find comparative fault in the stationary object.

Plaintiff argues that Defendants breached their duty of reasonable care, and that they violated a statutory duty. Defendants contend they fulfilled any duties owed to Plaintiff, and that they did not violate a statutory obligations. I agree with Defendants.

**1. Duty of Reasonable Care Under the Circumstances**

      Defendants argue that they fulfilled their duty as a wharfinger, and as a result no breach

can be found to support Plaintiff's negligence claim. A "wharfinger" is one who owns or

operates a wharf, dock or pier which may include pilings and dolphins. The duty of a wharfinger

is well-settled and has been described as follows:

> [A] wharfinger is not the guarantor of the safety of a ship coming to his wharf. He
> is, however, under a duty to exercise reasonable diligence to furnish a safe berth
> and to avoid damage to the vessel. This includes the duty to ascertain the
> condition of the berth, to make it safe or warn the ship of any hidden hazard or
> deficiency known to the wharfinger or which, in the exercise of reasonable care
> and inspection, should be known to him and not reasonably known to the ship
> owner. But there is no duty on the part of a wharfinger to provide a berth with
> safe surroundings (other than an entrance and an exit) or to warn that hazards exist
> in the vicinity. . . .

*Port of Seattle v. M/V Saturn*, 562 F.Supp. 70, 72 (W.D. Wash. 1983); See also, *Smith v. Burnett*,

173 U.S. 430, 433 (1899). In addition, a wharfinger is not required to warn of obstructions or

conditions that are open and obvious. *General Construction Co. v. Isthmain Lines, Inc.*, 259

F.Supp. 336, 339 (D. Or. 1966).

      For example, a wharfinger has a duty to repair a pile, or to warn about a pile, that has

broken and therefore become an unknown hazard to vessels using a wharf or pier. *See, Berwind*

*White Coal Mining Co. v. City of New York*, 48 F.2d 105, 106-07 (2nd Cir. 1931). In contrast, a

wharfinger does not have a duty to warn about a damaged pile fender when its very appearance

reveals it is under construction. *General Constr.*, 259 F.Supp. at 337. In each case, the duty of a

wharfinger is only to warn about the unknown hazardous *condition* of a stationary object that a

reasonable vessel owner would not otherwise recognize. It does not include a duty to warn of the

mere *existence* of an above-water stationary object.

Plaintiff argues that the Defendants' characterization of the wharfinger's duty is inapplicable in this instance because Defendants were not acting as a wharf for hire. Instead, Plaintiff was a passer-by and not one invited or intending to use the wharf. As such, Plaintiff urges the court to simply apply a standard of reasonable care under the circumstances. To that end, Plaintiff argues Defendants' duty to vessels passing-by in the dark is to warn of the dolphin's presence by either marking or lighting it, or to even remove the dolphin completely from the waterway. Of particular note, Plaintiff contends the nature of Defendants' docking facility had changed over the years. Once an active dock, the facility became largely unused. Plaintiff posits that Defendants may have had no duty to mark or light the dolphin when other activities at the dock would draw attention to the dangers that lie within. However, since the activity level declined or even stopped, Plaintiff asserts this is reason to impose a duty to mark, light or even remove the dolphin altogether.

Plaintiff is generally correct that duties can and do change based on a variety of factors. "Prosser and other commentators have made it plain that this concept of duty is a changing one. Different circumstances, different parties, and changing community standards can impose a duty where one did not exist before." *Wilcox v. Carina Maritime Corp.*, 586 F.Supp. 1475, 1478 (E.D. Tex. 1984). Ultimately, the scope of an actor's duty involves a "number of factors, most notably the foreseeability of the harm suffered by the complaining party." *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987).

> [the risks] against which the actor is required to take precautions are those which society, in general, considers sufficiently great to demand preventive measures. No person can be expected to guard against harm from events which are not reasonably to be anticipated at all, or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded.

*Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 437 (4th Cir. 1999) (quoting Prosser and Keeton on Torts § 31, at 170.)

Here, there is little support for Plaintiff's theory that Defendants had a duty to mark, light or remove the dolphin. Regular boat traffic does not travel in the area near the docking facility or dolphin. Neither the dolphin nor the docking facility has been struck in the past, nor have there been reports of near misses. Defendants' representative Richard Garber testified that the *closest* he had ever seen a boat pass by the docking facility was "at least 100 feet." (Pl's Response, #19, Att. 1 (Gutzler Decl. at Ex. 5 p. 31).) White's testimony confirms that travel so close to the Oregon shore is uncommon and dangerous. White knew his vessel was too far left and so attempted to maneuver right. After turning right, White turned back to the left to go around a slow moving boat which he knew returned him perilously close to the Oregon shore – an area where boats do not travel because it is dangerous. In sum, the harm incurred by Plaintiff was not reasonably foreseeable because the dolphin is in an area of the waterway that boats "passing by" should not, and do not, travel. In addition, the dolphin itself is a large structure extending between 4 and 26 feet above the water – it is not a hidden danger, but is the kind of structure that one would expect a reasonably competent boat operator would be on the lookout for and avoid, even in the dark.

On this record, that the use of the docking facility has declined over the years does not change my analysis. Plaintiff submitted no evidence that it was customary or industry practice to mark, light or remove such structures after a period of non-use. There is no evidence by way of expert testimony that a facility no longer in use creates a greater danger to boats passing by, and as a result incurs a duty to mark, light or remove its fixtures. There are no studies Plaintiff has

pointed out to support the contention that a dolphin owner's duty changes under these circumstances, and there is no anecdotal evidence or case law cited by Plaintiff to support this position. Finally, there is no evidence that Defendants had a statutory or regulatory duty to mark or light the dolphin, or to remove it when the docking facility stopped being used. The absence of such a rule is evidence that no duty exists. *Wilcox,* 586 F.Supp. at 1478.

This analysis tends to circle back to and explain the rationale behind the *Oregon* Rule which is that a vessel that strikes a stationary object usually does not do so unless it was mishandled. Here, it was dark and rainy. White was not using his GPS. Plaintiff had stopped aiding in navigation because he got too cold. White knew he was too far left and in great peril, but by then it was too late to avoid hitting the dolphin. Courts are still obligated to independently analyze whether any fault can be attributed to the stationary object. Construing the facts in the light most favorable to Plaintiff, no genuine issue of material fact exists with respect to whether Defendants had a duty to mark, light or remove the dolphin. They did not.

## 2. The Pennsylvania Rule

Under the *Pennsylvania* Rule, a party that violates a statutory rule intended to prevent collisions or allisions is presumed to be the contributing, if not the sole, cause of the collision. *The Pennsylvania,* 19 Wall. 125, 86 U.S. 125, 136 (1873). If a party establishes a violation of a statutory rule, the *Pennsylvania* Rule shifts the burden of proof to the party in violation of the statutory rule to prove that "the violation could not reasonably be held to have been a proximate cause of the collision." *Trinidad Corp. v. S.S. Keiyoh Maru,* 845 F.2d 818, 824 (9th Cir. 1988). The party seeking to invoke the *Pennsylvania* Rule has the burden to prove that there was a statutory or regulatory violation. *Hatt 65, LLC v. Kreitzburg,* 658 F.3d 1243, 1251-52 (11th Cir.

2011). The *Pennsylvania* Rule is a rule regarding the burden of proof, not a rule of ultimate liability. *See American River Trans. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 449 (5th Cir. 1998).

Plaintiff asserts the *Pennsylvania* Rule applies here because Defendants allegedly violated a term in the 2000 Army Corps of Engineers permit to build the dolphin. The term Plaintiff points to is a provision that requires transfer of the permit upon sale of the property. Plaintiff offers a strained interpretation that the transfer term lived on after permit's expiration. Clearly, the 2000 Army Corps of Engineers permit is a construction permit which required the dolphin to be built to certain specifications. Within a matter of months, the dolphin was built and a Compliance Certification establishes all the terms of the permit were fulfilled. Based on this evidence, I find that Defendants were not required to transfer the permit after construction of the dolphin was completed, and as a result Defendants did not violate the transfer provision of the permit.

Even if Defendants violated a term in the permit, at best it would amount to a contractual violation. Violations of contractual provisions do not amount to statutory or regulatory violations for purposes of invoking the *Pennsylvania* Rule. *Evergreen Intern., S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 310 (2008).

Moreover, the *Pennsylvania* Rule is limited to violations of statutes or regulations "intended to prevent the catastrophe which actually transpired." *Dir. Gen. of India Supply Mission v. S.S. Maru*, 459 F.2d 1370, 1375 (2d. Cir. 1975). In other words, "the injury must be of the kind intended to be prevented by the statute or regulation that the defendant violated." *MacDonald v. Kahikolu, Ltd.*, 581 F.3d 970, 975 (2009). Plaintiff has not made this threshold causal connection. A contractual term requiring transfer of a dolphin construction permit has no

bearing on the safety of the dolphin to recreational boaters in the relevant waterway. If Defendants would have transferred the permit as Plaintiff suggests they should have, it would not have made the allision less likely to occur. The dolphin would still have been in its permitted location and in its permitted condition at the time of the allision.

Plaintiff's reliance on *City of Portland v. Luckenbach S.S. Co.*, 217 F.2d 894 (9th Cir. 1954) is inapposite. There, the city positioned the boom of a crane over the Willamette River, left it there for over two and a half years, and never obtained an Army Corps of Engineers permit to maintain a boom in the waterway. Because the city did not obtain a permit, the boom was considered an unauthorized obstruction to navigation in violation of the River and Harbors Act, 33 U.S.C. § 403. *City of Portland*, 217 F.2d at 898. In stark contrast, Defendants here applied for, obtained, and successfully fulfilled the requirements of a permit from the Army Corps of Engineers, and therefore complied with the River and Harbors Act. In any event, the *City of Portland* did not involve application of the *Pennsylvania* Rule and in that regard is no help to Plaintiff.

For the reasons stated above, Defendants did not violate a statute or regulation intended to prevent this type of allision, and as a result the *Pennsylvania* Rule does not apply.

///

///

///

///

///

///

Page 13 - OPINION AND ORDER

## CONCLUSION

Defendants' motion for summary judgment (#14) granted, and Plaintiff's claims are dismissed with prejudice. Final judgment should be prepared.

Dated this 7th day of May, 2013.

Honorable Paul Papak
United States Magistrate Judge